STATE OF MISSOURI AT THE RELATION OF AND TO THE USE OF THE KANSAS CITY TITLE AND TRUST COMPANY, RESPONDENT, v. GUSTAV H. OTTO AND FIDELITY AND DEPOSIT COMPANY OF MARYLAND, A CORPORATION, APPELLANTS.

Kansas City Court of Appeals. May 25, 1925.

1.—Demurrer—On Demurrer, Testimony Taken in Most Favorable Light to Plaintiff. In considering demurrer, appellate court required to take testimony in its most favorable light to plaintiff.

2.—Notaries—Negligence—False Acknowledgment—In Suit for Taking False Acknowledgment, Defense of Contributory Negligence May be Made. In a suit based upon a false acknowledgment taken by a notary, the ground upon which notary and his sureties are held is that of negligence, and defense of contributory negligence may be made.

3.—Same—Acknowledgment—Certificate of Acknowledgment of Notary May be Relied Upon. One is entitled to rely upon a notary's certificate and is not required to doubt the truth of the certificate and go out and verify its statement.

(429)

**4.—Appeal and Error.—On Demurrer to Evidence, Appellate Court Does Not Draw Any Inferences in Favor of Defendant.** On demurrer to evidence, appellate court does not draw any inferences in favor of defendant, except possibly where only one inference is permissible, and that against plaintiff.

**5.—Notaries—Contributory Negligence in Failing to Discover Forgery of Deed Held for Jury.** In a suit against principal and sureties on notary's bond for loss sustained by taking false acknowledgment to deed, without proof of identity required by section 2192, Revised Statutes 1919, the name of real owners having been forged, question whether plaintiff, who guaranteed title to property described in deed when loan was made, or lender or their agents were guilty of contributory negligence in failing to discover the fraud, held for jury.

**6.—Same—Whether Parties Relief on False Certificate of Acknowledgment of Notary, Held for Jury.** In suit on notary's bond for taking false acknowledgment to deed, to which name of real owner had been forged, question whether plaintiff, who had guaranteed title when loan was made on property described in deed, and lender relied on certificate of acknowledgment of notary, held for jury.

**7.—Same.—Plaintiff Held Entitled to Recover if False Acknowledgment Was One of Concurring and Proximate Causes of Loss.** In suit on notary's bond for taking false acknowledgment to deed to which names of true owners had been forged, held defendants were liable if acknowledgment was one of the concurring and proximate causes of the loss sustained by plaintiff.

**8.—Same—Evidence Held Admissible as Link in Chain Showing Fraudulent Transaction.** Evidence that party perpetrating forgery of deed kept real owners of property, described therein, in a lawyer's office while fraudulent transaction was being consummated, held properly admitted as link in chain showing fraud.

**9.—Same. Evidence of Owner as to Conduct and Statements Made by Party Perpetrating Forgery of Deed, Held Competent to Show Fraudulent Transaction.** Evidence of real owner of property that party perpetrating forgery of deed told him that another party would not have anything further to do with property, and that he would buy it, and that he thereupon took the abstracts, held competent.

**10.—Instruction—Instruction Held Not to Assume Facts or to Comment upon Evidence.** An instruction submitting that it was admitted that acknowledgment was a false certificate and that persons appearing before notary were not personally known to notary, etc., held not erroneous as assuming such facts and as a harmful comment upon the testimony, but tended to clear up the issues.

**11.—Same—Instruction as to Duty of Notary and Whether Justified is not Complying with Law, on Ground Other Notaries Were Deceived, Held Not Prejudicially Erroneous.** Instruction as to duty of notary and whether he was justified in not complying with law on ground that other notaries were deceived, held not prejudicially erroneous where concluding part thereof told jury that they could not find for plaintiff, if either plaintiff or lender was guilty of contributory negligence, and jury was amply instructed on contributory negligence in instructions requested by defendants.

**12.—Same—Instruction as to Duty of Notary, Though Comment on Evidence, Held Not Prejudicially as Notary was Guilty of Negligence Per Se.** Instruction as to duty of notary and whether he was justified in not complying with law on ground other notaries were deceived, though comment on evidence, held not prejudicially erroneous, because notary was guilty of negligence **per se.**

**13.—Same—Instruction as to Reliance upon Notary's Certificate of Acknowledgment Held Not Error.** An instruction that if falsely executed and acknowledged deed was known to have been filed by plaintiff and by lender, or their agents, and that, in part, reliance upon notary's certificate, lender loaned to grantee, etc., **held** not error, as there was no merit in defendant's contention that "part reliance" as used therein is not reliance.

**14.—Same—Modification of Instruction as to Liability of Notary for False Acknowledgment, Held Proper.** An instruction modified by court to read that if notary's certificate to deed "was not a proximate cause" of damage sustained by plaintiff, then verdict should be for plaintiff for nominal damages, **held** proper.

---

\*Corpus Juris-Cyc. References: Acknowledgments, 1CJ, p. 902, n. 90, 95; p. 903, n. 7; Appeal and Error, 4CJ, p. 764, n. 80; p. 1029, n. 30; p. 1039, n. 4; Evidence, 22CJ, p. 165, n. 82; Notaries, 29Cyc, p. 1104, n. 11; p. 1106, n. 19 New; Trial, 38Cyc, p. 1653, n. 11 New; p. 1666, n. 83; p. 1720, n. 39; p. 1778, n. 73; p. 1779, n. 74, 75, 76.

Appeal from the Circuit Court of Jackson County.—Samuel A. Dew, Judge.

AFFIRMED.

*Arthur N. Adams* and *J. M. Johnson* for respondent.

*Miller, Winger & Reeder* and *F. E. Whitten* for appellants, Fidelity and Deposit Company.

BLAND, J.—This is a suit against the principal and sureties on a notary's bond in the sum of $5000. There was a verdict and judgment in favor of plaintiff in the amount of the bond and defendants have appealed.

The suit is based upon a false acknowledgment taken by defendant, Otto, a notary public of Kansas City, Mo., to a certain deed purporting to be executed by Ada M. Marshall and Charles Marshall, her husband. Plaintiff having guaranteed the title to the property covered by the deed to one J. M. Clark for the purpose of his making a loan upon the property, the title having failed and Clark having lost his money by reason of the forgery of the name of the Marshalls to said deed, plaintiff brought this suit against Otto and his bondsman. The suit is based in the first count on plaintiff's damages suffered by reason of having paid Clark the amount of his loss under the terms of its guarantee of title, and in the second count as the assignee of Clark's cause of action against the defendants.

The facts show that prior to October 12, 1922, one Jerome P. James had been negotiating with the real Marshalls in reference to first trading for and then buying from them the property described in the warranty deed in question. James finally agreed to buy their property for $85,000, and the property adjoining their belonging to Mrs. Marshall's sister for $35,000. On said day the defendants de-

livered their abstracts to said property to James who took them to the plaintiff, Kansas City Title and Trust Company, and made an application for a guaranty policy of the title to said property. He stated to plaintiff that the title was then vested in Ada Marshall and that he was buying the property.

On October 13, 1922, plaintiff sent its inspector to view the property who ascertained from Mr. Marshall that the Marshalls were the owners of the property, were residing there and in possession thereof and were negotiating with James in reference to selling it. The inspector made his report to plaintiff of these facts. James applied to Clark, a real estate broker in Kansas City, Missouri, for a loan of $40,000 on the property, representing that he was trading some land in Tennessee to the Marshalls for their property in Kansas City and by the terms of the trade it was necessary for him to pay the Marshalls a difference of approximately $33,000 in cash. The title company·issued its preliminary opinion showing that the title to the Kansas City property was fully vested in Ada Marshall, subject to the payment of some taxes which the real Marshalls paid before the deal was closed. James took this opinion to Clark to examine. Clark made at least four different inspections of the property and on one occasion attempted to interview the Marshalls, but they were not at home. The Marshall property consisted of two large flats and a detached house at the corner of 11th and Campbell Streets, in Kansas City, Mo. The Marshalls lived in the house and rented out the flats to various tenants. Plaintiff indicated that it would issue its guaranty policies to Clark covering the loans to be made by him.

On or about October 23, 1922, Clark notified James that he would make the loan, which was to be a first of $25,000 and the second of $15,000, Clark to receive a cash commission of $5,000 for making the loan. It was agreed that James's brother, Fred James, should excute the notes and mortgages desired by Clark. These papers were signed in Clark's office on October 23, 1922, and acknowledged in his office by a notary public therein. On the same day they were taken to the plaintiff and delivered into the possession of its escrow department in charge of one Armstrong. On October 24, 1922, Armstrong had a telephone conversation with the real Mrs. Marshall. At that time Jerome James had exhibited a contract to Armstrong which provided for the exchange of lands in Tennessee for the Kansas City property, and purporting to be between James and the Marshalls, the latter to receive a difference of approximately $33,000 in cash in the trade.

Armstrong testified that Mrs. Marshall called him up concerning the transaction that she had pending with James and that in the course of this conversation he told her that he would have the $33,000 for

her the next morning and that she should be at plaintiff's office at that time with the deed and get her money. Armstrong told her that James had a contract at his office in which she was trading her property and getting something like $33,000 in cash. Mrs. Marshall did not tell Armstrong that she was not trading for the property but said she had not signed any contract and was not to get $33,000 but some eighty odd thousand dollars in cash. He told her he didn't know much about it because he didn't look at the contract very carefully but that ''we will work it out tomorrow morning when you come in to close the deal.'' She did not say whether she would be in the next morning. She told Armstrong that she was ''on a deal with James;'' that was the way he understood it; she did not say that she would not trade the property but that she was to get eighty and some odd thousand dollars in cash. Armstrong testified that he understood from what the Marshalls said that the ''deal was still pending and had not been settled.'' The evidence shows that one Lobb, a representative of Clark, was in plaintiff's office at the time Armstrong had the telephone conversation with Mrs. Marshall and Armstrong told Lobb of it at the time. The impression that the telephone conversation had upon Armstrong was that he thought Mrs. Marshall was a difficult person to deal with. Later in the afternoon Mr. Marshall called up Armstrong and had a similar conversation with him in which the former said emphatically that the Marshalls did not sign any contract but that they were to get some $80,000 in cash and not $33,000, but he did not say that they would not be down the next morning.

The Marshalls' version of this conversation was somewhat different from that of Armstrong. They testified that they told him not only that they had not signed any contract but that if he had any contract in his office, it was a forgery. Armstrong denied that Mrs. Marshall mentioned anything about a forgery and stated that he did not remember whether Marshall had mentioned it. Mr. Marshall testified that they said they would not be down the next morning; that they told Armstrong that they were not trading for any property, but that they were selling their property and also the property of Mrs. Marshall's sister, adjoining theirs, for $35,000 cash, and that they were to have $85,000 cash and the sister to have $35,000 cash. Mrs. Marshall testified that Armstrong called her instead of her calling Armstrong.

The point is made that defendants' demurrer to the evidence should have been sustained. In view of this point we are required to take the testimony in its most favorable light to plaintiff and therefore must accept Armstrong's version of the conversation. He further testified that the Marshalls did not come in the next morning and that he

turned the whole matter over to one Eisenman, an employee of plaintiff, about noon of Thursday, October 26th, and then left on his vacation; that when he turned the papers over to Eisenman he explained the matter to him and told him of his conversation with the Marshalls.

On October 25, 1922, James took a Mrs. Boyd and a man by the name of Williams before the defendant Otto. Williams had signed the name of Marshall to the deed purporting to convey the Kansas City property to Fred James and Mrs. Boyd in the presence of Otto signed the name of Mrs. Ada Marshall to the deed, and Otto took their acknowledgment and certified that they were personally known to him to be Mrs. Ada Marshall and Charles Marshall. Otto did not know James or any of the parties appearing before him or the real Marshalls, and did not have the identity of the Bogus Marshalls proved by two witnesses as required by the statute. [Sec. 2192, R. S. 1919.] The deed purported to convey the Kansas City property for the sum of $85,000 and did not recite any exchange of real estate. Mrs. Boyd retained this deed in her possession and went with James on the afternoon of October 25th to Clark's office and there made arrangement to close the trade on the next day at the courthouse. Clark desired the deal to be closed at plaintiff's office but Mrs. Boyd did not want to do this, giving as an excuse that a suit had been brought by one Walker against Mrs. Marshall for a real estate commission for the sale for $85,000 of the property to Fred James, and the *pseudo* Mrs. Marshall was afraid that the money would be tied up by Walker. The petition in that suit which was actually pending appeared upon the abstracts examined by plaintiff when it made the preliminary report. The *pseudo* Mrs. Marshall told Clark that she had in her possession her deed properly executed but did not exhibit it to him at that time.

On Thursday, October 26th, Mrs. Boyd, impersonating Mrs. Marshall, and James again went to Clark's office and Clark asked her concerning her property, whether there were any bills against it, etc., and she replied that she did not think so, that "her husband had attended to most of these things" and thereafter Clark prepared an affidavit which she signed stating that she was the owner of the property; that the property was free and clear of all indebtedness; that there were no unpaid bills of any nature; that there were no mechanic's liens against the property and that if there were any unpaid bills she would take care of them. This affidavit was signed by Mrs. Boyd in the name of Ada M. Marshall and sworn to before a notary in Clark's office.

Either at the time of the first or second visit of Mrs. Boyd to Clark's office, presumably the second, Clark requested his attorney,

Mr. John P. Gilmer, who was an expert title examiner of thirty-one years' experience, to examine the warranty deed to see whether it was properly executed. Mr. Gilmer examined the deed and acknowledgment and reported to Clark that the deed was in proper form. On the afternoon of Thursday, the 26th, the parties, including Mrs. Boyd impersonating Mrs. Marshall, Mr. Lobb, of Clark's office, Mr. Gilmer, attorney for Clark, Mr. Eisenman, of plaintiff's office, Jerome P. James, the instigator of the fraud, and Fred W. James, went to the office of the Recorder of Deeds in Kansas City where Mr. Gilmer again looked over the deed and passed upon it as being in proper form, and the deed together with two deeds of trust which had formerly been executed by Fred W. James were recorded and Mr. Gilmer reported to Clark that the deal was properly closed.

Clark as a part of the loan had issued to his representative Lobb his check on the New England National Bank in the sum of $33,765. Eisenman, at the Recorder's office, informed the parties that plaintiff would not issue to Clark its guaranty policies on the property until it had time to search the records to see whether or not anything had been filed prior to the filing of the deeds on October 26th, and the check was turned over to plaintiff by Lobb to be held until plaintiff was ready to issue its guaranty policies to Clark, guaranteeing that the deeds of trust were the liens on the property that they appeared to be. The *pseudo* Mrs. Marshall was told that she could get the check the next day after eleven o'clock at plaintiff's office. While the parties were at the courthouse Eisenman asked Jerome James about the deed to the Mississippi or Tennessee land and the said James took out of his pockets a paper claiming that it was a deed to some Mississippi or Tennessee land. The *pseudo* Mrs. Marshall then said, "You cannot give them that deed without they give me this check, I don't want you to give them that deed." Eisenman gave a receipt to the *pseudo* Mrs. Marshall and to Clark to the effect that plaintiff had received the check and would deliver it to Mrs. Marshall the next morning if there were no judgment against her. The pretended Mrs. Marshall did not call for the certified check the next day but sometime during the afternoon of that day Jerome James appeared at plaintiff's office and produced a note purporting to be signed by Mrs. Marshall requesting plaintiff to turn the certified check over to James for her and said that Mrs. Marshall's controversy with Walker was being settled. Plaintiff refused to give James the check.

Eisenman testified that on Saturday morning, October 28th, Lobb called him up and asked if the check had been delivered to Mrs. Marshall and on learning that it had not, Lobb requested Eisenman to hold the check until he could get a list of the tenants and amount of rentals from Mrs. Marshall, she having agreed to give this list to

Clark, who was to handle the renting of the property for James. Lobb also said, "I got some little information that leads me to believe that I ought to learn a little more about this before we deliver this check." Lobb further stated to Eisenman to the effect that "something looked a little funny" and that he wanted to investigate it. Eisenman advised him "to be dead certain" about the matter. On the afternoon of this day Lobb called up the Marshall residence and asked for Mrs. Marshall and being told by Mrs. Marshall's niece that Mrs. Marshall was not at home, Lobb asked why Mrs. Marshall has not called at plaintiff's office to get her check for $33,765 and the niece replied that her aunt did not have any deal on for that amount of money. Lobb then asked what she knew about it and she replied, "I know all my aunt's business." This incident does not seem to have been followed up in any way by any of the parties.

On Monday morning, October 30th, about noon, James appeared at plaintiff's office and stated that Mrs. Marshall was waiting at the New England National Bank for her check. It was still being represented that Mrs. Marshall was afraid to appear at plaintiff's office on account of the Walker suit. Eisenman then called Lobb and asked him if it was all right to deliver the check and Lobb stated that it was, and that he would come over to plaintiff's office. Plaintiff endorsed the check payable to the order of "Ada M. Marshall" and Eisenman and Lobb went with the check to the New England National Bank where it was delivered to the *pseudo* Mrs. Marshall. Still claiming that she was afraid of Walker, she stated that she desired to obtain the money from the bank in cash. The bank required the identification of Mrs. Marshall and Clark upon being called up directed the bank to pay the check to Mrs. Boyd, representing herself to be Mrs. Marshall, in cash, which the bank did. James gave Mrs. Boyd $6,000 and decamped with the remainder and has been a fugitive from justice ever since.

During October 27, 28 and 30th James had the real Marshalls in a lawyer's office waiting for him to consummate the deal whereby he was to buy theirs and the sister's property and to pay over the money, at which time they were to deliver to him a deed to the property.

Clark, after the discovery of the fraud, recovered a large part of the money including that which had been given to Mrs. Boyd by James. By this method his loss was reduced to the sum of $15,675.72. Plaintiff made some additional recoveries reducing the loss to plaintiff company to the sum of $12,375.72.

It is insisted that the court erred in refusing to instruct the jury at defendants' request that plaintiff should recover nominal damages only. This is contended, first, because plaintiff and Clark had actual knowledge that the transaction was a fraud; second, because plain-

tiff and Clark were guilty of contributory negligence as a matter of law; third, because plaintiff and Clark did not rely upon the notary's certificate of Otto to the deed to the Marshall property but relied upon their own information concerning the identity of Mrs. Marshall; and, fourth, because the proximate cause of the loss, in addition to the above, was the cashing of the check by false endorsement and identification of the bogus Ada M. Marshall as the real Mrs. Marshall to the bank by Clark and his agent, Lobb. What we will say in disposing of the plea of contributory negligence will necessarily dispose of the first point.

Of course, the ground upon which the notary and his sureties are held is that of negligence and the defense of contributory negligence may be made. [State to use v. Plass, 58 Mo. App. 148.] It is insisted that there was contributory negligence in the failure of plaintiff to attempt to ascertain why Mr. Marshall did not appear on the scene during any of the steps in the transaction up to the time the money was paid over, when the purported contract for the exchange of the property that was seen by plaintiff bore the signature of Charles Marshall only; second, that plaintiff had actual notice from Charles Marshall that the Marshalls were not exchanging their Kansas City property for other land and receiving $33,000 in cash but that they were selling their property for $85,000 in cash and not trading it; that Charles Marshall told plaintiff that any contract they had purporting to exchange property was bogus and a forgery; that under these circumstances plaintiff or Clark should have made some investigation to find out the true facts.

It will be remembered that the property belonged to Ada Marshall. If the bogus contract purported to be signed by Mr. Marshall only it was natural to presume that it was signed by him as the agent of his wife. We cannot say as a matter of law that there is anything in this circumstance so unusual as to naturally arouse suspicion on the part of the parties. As to the telephone conversation, as we have before stated, there is some conflict in the testimony and we must take that of Armstrong rather than that of the Marshalls. At the time of this conversation plaintiff had knowledge of the fact that Walker had sued Mrs. Marshall for a commission for selling the property to Fred W. James, therefore, when it was thereafter represented that Mrs. Marshall did not want to appear in plaintiff's office, fearing that the money coming to her in the deal would be attached, plaintiff had every reason to accept the statement at its face value.

It is admitted that at least there was a deal on between James and the Marshalls for a sale of the property. In the telephone conversation had between Armstrong and the Marshalls it was assumed by all parties that some kind of a deal was on, the Marshalls claiming that

the deal was in terms different from that represented by Armstrong. Armstrong told them that the matter would be ironed out the next day when they were to meet at his office. He thought that the terms had not been entirely agreed upon, and that Mrs. Marshall was a person hard to deal with. The failure of Mrs. Marshall to appear the next day could naturally be referred to the representation afterwards made that she was afraid to appear on account of the Walker suit. Of course, there was no reason why a person could not change her mind concerning a deal of this kind. It is well settled that one is entitled to rely upon a notary certificate and is not required to doubt the truth of the certificate and go out and verify its statement. [State ex rel. v. Surety Co., 187 Mo. App. 39, 46, 47; State ex rel. v. Balmer, 77 Mo. App. 463, 473.] When Mrs. Boyd, fortified with a warranty deed properly acknowledged before a notary public, appeared at Clark's office to close the deal, so far as being the real Mrs. Marshall was concerned, she was there. There was no occasion from their viewpoint to call her up or to ascertain in any other way anything further about the matter. Whether the parties should have made any further investigation under the circumstances was at least a question for the jury.

The conversation between Lobb and Mrs. Marshall's niece comes into the record by reason of the testimony of Mrs. Marshall who stated that Lobb admitted after the fraud was exposed that he had this conversation. We have searched the voluminous record before us and fail to find where Lobb denies this statement. However, assuming that this conversation took place, it was not with Mrs. Marshall but with her niece and the niece's version of the matter was the same as that of the Marshalls at the time Armstrong had a conversation with Mrs. Marshall. The jury could say that Lobb was justified in believing that the niece was not familiar with the situation notwithstanding the fact that she said she was, for the reason that the niece was stating Mrs. Marshall's apparent position on October 24th and not her purported position at the time of Mrs. Boyd's appearance at Clark's office and the office of the Recorder. Mrs. Boyd's appearance as far as Lobb was concerned was the appearance of the real Mrs. Marshall. These matters were all questions for the jury.

An effort has been made to connect the conversation with the niece with the statement of Lobb to Eisenman that something peculiar had come up in reference to the matter which he wanted to investigate. The record shows that the conversation with the niece was after this statement, if it was made, by Lobb to Eisenman, the statement having been made on Saturday morning and the conversation with the niece was had on Saturday afternoon. Lobb said that he did not remember making any such statement to Eisenman. What it was, if anything,

that seemed to be suspicious to Lobb, is not disclosed in the testimony and the inference is that it was not anything in connection with the identity of Mrs. Marshall for the reason that Lobb went ahead and closed up the transaction. Eisenman asked Lobb on the morning of the 30th if he had satisfied himself about the matter and Lobb said that he had. When Lobb made this last statement and went ahead and closed the deal, this was notice to Eisenman that there was nothing in the former's suspicion, if any, that Lobb had formerly intimated to Eisenman.

It was not incumbent upon plaintiff to see that Mrs. Marshall got her deed to the Mississippi or Tennessee land. While the forged deed purporting to involve $85,000 did not mention an exchange of property, it was not necessary that the deed should mentioned what the actual consideration was, or what the $85,000 actually represented.

It is pointed out that attorney Gilmer testified that if he had known of the conversation between Armstrong and the real Mrs. Marshall, to the effect that "she had not signed any contract and was not to get any check for $33,000," that he would have brought the matter to the attention of Clark. In other words, that he would not have permitted the deal to go through without Clark's consent. We fail to see why this statement of Mr. Gilmer, a very careful man, having been an examiner of titles for a great many years, should bind the jury. Whether or not there was contributory negligence in the case was not a question of expert testimony and if it was, the jury were not required to believe any such testimony, if any there was. In addition to this, in the question which Mr. Gilmer answered all the facts and circumstances surrounding the conversation and the facts thereafter occurring were not submitted to him. The only matter submitted was merely that Armstrong sometime previously had such conversation.

The refusal of Eisenman to deliver the check to James is argued as sufficient to show that Eisenman thought there was something wrong and that he should have called the real Mrs. Marshall over the telephone. But there was nothing unusual about this circumstance, Mrs. Marshall was on the opposite side of the deal from James and it was quite natural for the plaintiff to refuse to deliver such a large check to anyone but Mrs. Marshall while at the same time regarding James as a man of ordinary honesty.

Before taking the *pseudo* Mrs. Marshall's affidavit, Clark asked her concerning the flats and she stated to him that Mr. Marshall kept the books and she did not know what the rentals were; that Marshall attended to the buying of the coal but she did state that there were no outstanding bills against the property in the way of repairing and decorating. It is insisted that "her hesitancy and evasive answers

should have aroused the suspicion of any person familiar with the handling of properties; that Clark's suspicions were aroused for the reason that he had her sign and swear to the affidavit we have described. It seems that any precaution taken by anyone in closing this deal is attempted to be used by the defendants against the parties dealing with the bogus Mrs. Marshall, but the jury were authorized to infer directly the opposite of what is claimed by defendants.

It is claimed that the taking of the affidavit of Mrs. Boyd by Clark shows that Clark then was not sure that the person who represented herself as being Mrs. Marshall was in fact such, because in the affidavit she swore that she was the owner of the property. This part of the affidavit may have been merely incidental. The other facts stated therein in reference to the mechanic's liens and bills against the property and the fact that he had her swear that there were none, or some evidence tending to show that he was satisfied at that time that she was the real Mrs. Marshall for only the real Mrs. Marshall would know those facts stated in the affidavit. However, the statement that she owned the property was not necessarily aimed at her identity but rather as to the title of the real Mrs. Marshall. We fail to see anything in this particular circumstance tending to show negligence on the part of Clark.

It is insisted that plaintiff was advised on Saturday, the 28th, that Mrs. Marshall had settled her matter with Walker and there was no reason why Mrs. Marshall should not come to plaintiff's office thereafter to get her money. Apparently the excuse for sending James for the money was because "Mrs. Marshall" was then afraid of Walker. The testimony was not that the suit had been settled but that Mrs. Marshall was "settling up" the matter on the 28th, the inference from the evidence is that she had not settled at the time the bogus Mrs. Marshall received the money from the bank.

It is insisted that Clark was negligent in causing Mrs. Boyd to be identified at the bank as Mrs. Marshall. There was a conversation between Eisenman and Lobb at this time before Clark was called up as to the advisability of identifying the woman. Lobb testified that Eisenman said "it is a one hundred to one shot it was all right, but it is your party." Lobb replied, "We are going ahead on the basis that Lex McDaniel is acquainted with some people James is acquainted with in Mississippi or Tennessee." The evidence shows that Lex McDaniel was an officer of the plaintiff company. Eisenman testified that he told Lobb to "Use your own judgment. You know the woman; you introduced her to me, and she is the one that you got the deed from, and you are acquainted at the bank, and it is your check. . . . Do as you please."

Eisenman did not testify that Lobb said anything about McDaniel's acquaintance with some people that James was acquainted with in Mississippi or Tennessee. However, after Lobb stated that he said this, he did not rely entirely upon this circumstance. The record so shows and it is not reasonable to suppose that he placed any great reliance upon it for the reason that no sensible person would do so. This, however, will be discussed later or in connection with whether the cashing of the check was the sole proximate cause of the loss.

An unfavorable inference is attempted to be drawn against plaintiff because the real Mrs. Marshall appeared at the office after the fraud came to light demanding that it clear her title because she had told Armstrong the things we have mentioned in the Armstrong-Marshall telephone conversation. Plaintiff's officers first denied the telephone conversation but when Armstrong was called in he admitted it. In the contract of assignment between Clark and plaintiff, the latter agreed to bring necessary suits to clear the title of the deeds unauthorized by the Marshalls, and it is said that plaintiff has cleared the title. It is claimed that plaintiff by this procedure has admitted its fault. But the clearing of the title could just as well be referred to plaintiff's undertakings in its guaranty of title as to what defendants urge. On a demurrer to the evidence we do not draw any inferences in favor of defendant (except, possibly, where only one inference is permissible and that against plaintiff), but rather in behalf of plaintiff.

We do not think that any one of the circumstances urged by defendants as showing contributory negligence, or all of them taken together, establish that plaintiff or Clark or their agents were guilty of contributory negligence as a matter of law. The facts show that Clark was cautious in making the deal; he not only required a guarantee of title but had his own attorney examine the deeds to see that they were properly recorded and took an affidavit from the supposed Mrs. Marshall in regard to the title and circumstances concerning the property. The title company refused to guarantee the title until it had time to investigate the records even after the deal was closed and the deeds recorded and it was cautious in seeing that the supposed Mrs. Marshall actually received the money.

It is insisted that Clark and plaintiff did not rely on the certificate of Otto but relied upon their own information concerning the identity of the bogus Marshalls and James's introduction of the supposed Mrs. Marshall and their confidence in him. The information that Lex McDaniel had concerning James, most of which he imparted after the fraud was disclosed, amounted to but little. This information McDaniel obtained from James and consisted of the fact that

McDaniel had a sister living in the south in the vicinity of where James said he came from and that McDaniel and James found they had a mutual acquaintance in Tennessee. McDaniel knew nothing whatever about James. He had no information concerning him and according to his testimony did not recommend him to anyone. He testified that he did not tell Clark until after the fraud was disclosed that he understood that James came from a fine family. Under this point the defendants have referred to the failure of Charles Marshall to personally appear in the transaction and to other matters that we have already alluded to and discussed.

It is insisted that Clark did not rely upon Otto's certificate for the reason that the notes and mortgages had been executed, acknowledged by a notary in Clark's office and accepted by Clark at the time the certificate was made; that his acceptance of Fred James upon the introduction of Jerome P. James indicates that Clark was relying upon the representations of Jerome James and his identification of Mrs. Marshall; that neither Clark, his representatives nor plaintiff ever saw the deed until the transaction at the courthouse; that Clark talked to the *psuedo* Mrs. Marshall concerning her ownership of the property and identified Mrs. Boyd as Mrs. Marshall at the bank so that the money could be procured, showing that they were not relying upon the certificate.

As to the execution of the mortgages by Fred James, the identification of him is not overly important. He was the real party who it was intended should execute the deeds and they would have been perfectly good if it had not been for the forged warranty deed. The deeds of trust, of course, were executed and accepted on the theory that there was to be a valid deed conveying the property from Ada M. Marshall to Fred W. James. The warranty deed was the basis of this entire transaction. Without the warranty deed the deal could not have been made. Clark did not pay over the money when he received the deeds of trust and notes but waited until the deed from Ada M. Marshall to Fred W. James was executed and placed on record and until he had his attorney examine all parts of the deed including the acknowledgment and until he had received a guarantee of title. The guaranty would not have been issued unless the warranty deed appeared to be valid and in proper form. By the taking of the acknowledgment to the warranty deed Otto enabled Mrs. Boyd to appear in Clark's office with a warranty deed apparently regular in form, including the acknowledgment. Although the deed was not examined by Clark before the deal was consummated, it was twice examined (the first time before the courthouse meeting) by his attorney upon whom he relied. The warranty deed was first recorded as a basis of the deeds of trust, the deeds of trust being re-

corded afterwards. The deeds of trust were not liens without a good warranty deed from Mrs. Marshall. It would seem that the fact that Clark requested his attorney to examine the deed at the former's office and sent him to the courthouse to see that the recording was done in a proper way, and the fact that he requested the guaranty policies from plaintiff, would show that he relied upon the false acknowledgment. Clark testified that he would not have paid out the money if he had known the certificate to have been false.

Plaintiff insists that Otto had no active part in the fraud and did not introduce Mrs. Boyd as Mrs. Marshall and the fact that the deed was acknowledged would not be evidence that the person who actually acknowledged it, in the absence of his introduction of such person, was the real Mrs. Marshall; that the person who produced the deed or someone else might have stolen it from the real Mrs. Marshall. As a matter of fact the deed was not stolen and such argument is entirely beside the question. The presumption was in favor of right conduct. Mrs. Boyd came to Clark's office fortified with a warranty deed, the acknowledgment recited that the persons who signed the deed were personally known to the notary and, of course, the certificate furnished evidence that the person who signed were the real Marshalls. It was the act of the notary that enabled Mrs. Boyd to have such a deed in her possession when she appeared with it. Such a deed in the possession of a woman representing herself as being Mrs. Marshall was evidence to Clark, his representatives and plaintiff that she was such. [See State ex rel. Peterson v. Mahon, 27 No. Dak. 92, 98.]

It was unnecessary in order to make out a case to show that the parties were deceived by solely relying upon the certificate of Otto for if they relied upon James's introduction together with the certificate by Otto, or on any other circumstance, it was sufficient if the acknowledgment was one of the concurring and proximate causes of the loss. [State ex rel. v. Surety Co., supra; State ex rel. Savings Trust Co. v. Hallen, 196 S. W. 1067, 1069; State ex rel. v. Surety Co., 254 S. W. 561.]

The identification of Mrs. Boyd as Mrs. Marshall at the bank was also a natural result of the execution of the acknowledgment although it may not have been brought about solely for that reason. At that time the transaction, as we have detailed it, was complete. The parties had been led to believe, partly at least by the false acknowledgment, that Mrs. Boyd was Mrs. Marshall. There was then nothing left but to turn the money over to her. Clark merely identified Mrs. Boyd as Mrs. Marshall so that his own check might be cashed. There was no difference in his paying the money by check than there would have been in his turning the money over in cash to Mrs. Boyd under

the assumption· that she was· Mrs. Marshall. ·.The identification was merely an incident resulting from all the facts that had gone before.

It is insisted that the court erred in admitting testimony of the fact that James kept the real ·Marshalls in a lawyer's office during the 27th, 28th and 30th of October. It is contended·that this·evidence tended to mislead the jury into believing that it would have done no good for plaintiff to have· called up ·the Marshall residence ·for ·the reason that the  Marshalls· were absent from home when as a matter· of ·fact there ·was no effort actually made to call them up· or get· in touch with the real Marshalls at·their home. ·This circumstance was merely a· link in the chain of the· evidence showing the fraudulent transaction and therefore··was· properly admitted. [State ex rel. v. Balmer, supra, 1. c. 470.] · The :fact· that the Marshalls were in a· lawyer's· office these three days had a· connection with several matters disclosed in the evidence. It bore upon the fact that the Marshalls were in fact attempting to dispose of·their property to James and were to close it up at once. The evidence also shows that while the Marshalls· were in· said office that James obtained from them a list of· tenants which he was required to do. The evidence objected to was of a general circumstance throwing light·upon the fraudulent scheme of James which is the foundation of the loss sued for. For the same reason Mr. Marshall's testimony that James told him that Walker would not have anything to do with the property further and that James would buy it for $85,000,· and thereupon took the abstracts,. was competent testimony. ·

It is insisted that the court erred in giving plaintiff's instruction No. 1. This· is a very long instruction and it would serve ·no useful purpose to further prolong this· opinion by ·copying it herein. ·It starts out by saying that it was admitted that the acknowledgment was a false certificate in that the persons appearing before the notary were not the· real Marshalls;·that it was admitted that the persons appearing· before the notary were not personally known to the notary and were not proved· to the notary ·by at least two witnesses to be the real Marshalls, ·etc. Otto himself admitted these facts and they are nowhere in· the record denied and it was not error to assume them in the· instruction. [Connor v. Railroad, 181 Mo. 397, 1. ·c. 415, 416.]· This part of the instruction ·was not· a harmful comment ·upon· the testimony but tended to clear up the issues in the case. It ·is insisted· that the instruction is erroneous in that part which reads as follows:

"·. . . it is immaterial, so· far as the duty of said notary· is concerned, that other· notaries were similarly deceived by said imposters and took their ·spurious acknowledgments to other instruments, or that the officers ,of plaintiff were misled by the deception of said imposters or. either of them into believing that the woman impersonating

the said Ada Marshall was the real Ada Marshall. The law imposed on the said Otto as a public officer the absolute duty of following the law and complying with its requirements.''

This comes very near being objectionable on the ground that it gives undue prominence to a part of the testimony, but we fail to see how it could have been harmful. This part of the instruction was not upon the question of contributory negligence but upon the question as to the duty of the notary and whether he was justified in not complying with the law on the ground that other notaries were deceived. The concluding part of the instruction directly told the jury that they could not find for plaintiff if either plaintiff or Clark was guilty of contributory negligence, and the jury was amply instructed on the question of contributory negligence in the given instructions requested by the defendants. There is no conflict between these instructions given in favor of defendants and plaintiff's instruction for the reason, as we have already stated, that the part of plaintiff's instruction we have quoted is not upon the question of contributory negligence at all, and the jury could not have been misled. Even though it were a comment upon the testimony, it was not prejudicially erroneous for the reason that the notary in this case was guilty of negligence *per se* and plaintiff would have been justified in having the court so instruct the jury. [State to use v. Meyer, 2 Mo. App. 413; State ex rel. v. Ryland, 163 Mo. 280; State ex rel. v. Surety Co., supra.]

Defendants complain of another part of the instruction reading as follows:

''Therefore, if you find from the evidence that the warranty deed thus falsely executed and acknowledged was filed for record and was known to have been filed by the officer, agents, or attorneys of plaintiff, and by J. M. Clark or his agent or attorneys and that *in part reliance* upon said certificate the said J. M. Clark loaned to the grantee in said deed the total sum of forty thousand ($40,000) dollars,'' etc. The effect of defendants' argument in this connection is that ''part reliance'' is not reliance but there is no merit in this contention.

It is insisted that the court erred in modifying defendants' instruction F which sought to tell the jury that if the certificate to the warranty deed ''was not *the* proximate cause of any damage, if any, sustained by either plaintiff or Clark, then their verdict should be for plaintiff for nominal damages only,''and which defined proximate cause. The court amended the instruction so that instead of it reading ''was not *the* proximate cause,'' it read ''was not *a* proximate cause.'' It is stated in this connection that the case was not tried on the theory that there were several concurring proximate causes. It is difficult to imagine a case where the act of some one

does not concur with the act of the notary in making the false certificate to cause the injury. [See Huene v. Cribb, 98 Pac. (Cal.), 80, 82.] As we have before stated, the fact that Clark and plaintiff relied in part upon the introduction of Mrs. Boyd by James would not prevent plaintiff from recovering if the false acknowledgment was one of the proximate causes of the loss. There are a number of other circumstances in the evidence which the jury might regard as proximate causes of the loss, and the modification of the instruction was proper. The false acknowledgment did not have to be the sole cause of the loss in order for plaintiff to recover. It is insisted that the negligence of plaintiff and Clark was the proximate cause of the loss, but we have already ruled this against the defendants.

It is insisted that the court erred in refusing to give defendants' instruction J which was in effect a demurrer to the evidence and sought to confine plaintiff's recovery to nominal damages by reason of the identification of Mrs. Boyd as Mrs. Marshall at the bank when the money was paid to her. But from what we have said, there was no error in the giving of this instruction. The case of Hatton v. Holmes, 97 California 208, is not in point. In that case, aside from the false certificate to the acknowledgment of the supposed owner of the property, the name of the real owner to whom the check was made out was forged. It was held that the proximate cause of the loss was the forgery of the name of the real owner on the check and that the bank was liable for paying the check because it paid it without hesitation or inquiry as to the identity of the person who received the money. That case was distinguished in a case more like the case at bar. [See Kleinpeter v. Castro, 103 Pacific (Calif.) 1090, 1092.] Nor is the case of State ex rel. National Bank v. Mee, 39 Okla. 775, in point. There the bank paid a forged check purporting to be that of a depositor made out in favor of Luly Shields who presented a deed acknowledged by Luly Shields and Mary Stone which purported to be made out in favor of the depositor. This deed was also a forgery and on the strength of the identification in the acknowledgment to the deed the bank paid the check. This use of the deed was not a natural consequence of the acknowledgment. The court in that case, as in the first California case cited, held that the bank was at fault in failing to discover the fact that the check was forged. The opinion refers to the fact that the bank was negligent in not making further investigation as to the identity of the party. The court at l. c. 780, 781 said—"Had the grantee in fact given his check by reason of the false certificate, there could be no doubt of his right of action against the notary."

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.